# UNITED STATES DISTRICT COURT

# DISTRICT OF SOUTH DAKOTA

# CENTRAL DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **3:23-CR-30092-RAL** |
| **Plaintiff,** | |
| **vs.** | **REPORT AND RECOMMENDATION FOR DISPOSITION OF MOTION TO SUPPRESS** |
| **JUSTINA LYNN COSTA, a/k/a JUSTINA SNOW,** | |
| **Defendant.** | |

In this drug case, the Court must decide three interrelated questions: whether officers had (1) a legitimate basis to make a traffic stop; (2) reasonable grounds to extend the stop; and (3) probable cause to search the stopped vehicle. Answering these questions all in the affirmative, the Court recommends that the pending motion to suppress—drug evidence seized from the vehicle search—be denied.

1

## BACKGROUND

Shortly before 8:00 a.m. on June 15, 2023, Ziebach County Sheriff Gary Cudmore received a call from Cheyenne River tribal dispatch about a blue vehicle with out-of-state license plates driving all over the road on U.S. Highway 212, west of Eagle Butte, South Dakota. Cudmore responded, located the vehicle, and began to follow it. As he did so, Cudmore briefed Cheyenne River Sioux Tribe Sergeant Jeremy Reede on the situation. Reede, who was in his unmarked vehicle nearby, turned around and got behind Cudmore's truck.

While trailing the vehicle, a blue Ford Mustang, Cudmore observed it swerve across the fog line[1] and move completely onto the shoulder. After a couple of seconds, the Mustang jerked back into its lane. Seeing what he believed to be a lane violation, Cudmore activated his overhead lights and stopped the car.

Cudmore and Reede contacted the driver who identified herself as Justina Snow. Cudmore asked Snow for her license, insurance, and registration. As she reached into the glove box to retrieve the latter documents, Cudmore noticed sores on her arms indicative of needle marks and drug use. Reede decided to go get his K-9, Rowdy, housed two miles away, to sniff the car for drugs. In tandem, Cudmore requested dispatch to run checks

---

[1] *See State v. Hett*, 834 N.W.2d 317, 318 n.1 (S.D. 2013) ("The 'fog line' is the solid white line on the right hand side of the lane of travel that marks the edge of the legally drivable portion of highway.") (citation omitted).

on Snow's name, license status, and vehicle registration. Dispatch informed Cudmore that Snow had a warrant for her arrest out of California. Cudmore asked dispatch to find out whether California wanted Snow held on the warrant.

Roughly eight minutes after departing the scene, Reede returned and deployed Rowdy. The dog exhibited alert behavior at the driver and passenger side doors of the Mustang. Reede determined that Rowdy's behavior provided probable cause to search the vehicle. Cudmore and Reede searched the car and found, on the rear floorboard of it, a plastic bag that contained large shards of methamphetamine. Cudmore arrested Snow and transported her to the Meade County Jail in Sturgis.

About three months later, a federal grand jury indicted Snow, charging her with possession with intent to distribute a controlled substance. She subsequently moved to suppress the items officers discovered, and seized, when they searched her vehicle and then supplemented her motion.[2] The government responded to the motion and supplement, opposing suppression altogether.[3]

## DISCUSSION

### I.    Traffic Stop

Snow first claims that Cudmore lacked probable cause or reasonable suspicion to believe she committed a traffic offense and therefore had no lawful basis to stop her.[4] She

---

[2] Docket Nos. 24-25, 38.
[3] Docket Nos. 29, 41.
[4] Docket No. 25 at 2-4.

alleges that her single line crossing failed to provide sufficient cause for Cudmore's stop.[5] Because the stop was unlawful, Snow says, all evidence gleaned from it is fruit of a poisonous tree and subject to exclusion.[6] In response, the government argues that the single lane crossing was enough to garner probable cause and that Snow's slow speed—25 miles-per-hour under the limit—was a secondary reason for the stop.[7] The latter argument—that Snow's sluggish rate of travel supported Cudmore's stop—does not, however, hold water given Cudmore's testimony that Snow's vehicle was not impeding traffic.[8]

The stop of a motor vehicle is a "seizure" of its occupants that must be conducted in accordance with the Fourth Amendment.[9] A traffic stop comports with the Amendment if it is supported by probable cause or reasonable suspicion.[10]

Probable cause for a stop exists "[a]s long as an officer objectively has a reasonable basis for believing that the driver has breached a traffic law."[11] "[A] minor traffic violation

---

[5] *Id.* at 3-4.

[6] *Id. at* 2-3, 7-8.

[7] Docket No. 29 at 4-6.

[8] *See* Suppr. Hr'g Tr. 48 (Nov. 9, 2023) (Q: "Was [Snow] impeding traffic or the movement of other vehicles while driving 40 miles-per-hour?" A: "No."); S.D. Codified Laws § 32-25-5.1 ("No person may drive a motor vehicle *at such a slow speed as to impede the normal and reasonable movement of traffic* except when reduced speed is necessary for safe operation or in compliance with law.") (emphasis added).

[9] *Brendlin v. California*, 551 U.S. 249, 255-59 (2007); *United States v. Hollins*, 685 F.3d 703, 705-06 (8th Cir. 2012).

[10] *United States v. Gordon*, 741 F.3d 872, 876 (8th Cir. 2013).

[11] *Id.* (alteration in original) (quoting *United States v. Coney*, 456 F.3d 850, 856 (8th Cir. 2006)).

provides probable cause for a traffic stop, even if it is mere pretext for a narcotics search."[12]

The less-rigorous standard of reasonable suspicion arises when an officer "is aware of particularized, objective facts which, taken together with rational inferences from these facts, reasonably warrant suspicion a crime is being committed."[13] An officer "must be able to articulate something more than an 'inchoate and unparticularized suspicion' or 'hunch.'"[14] Some minimal level of "objective justification" for making the stop is required.[15]

## A. Single Fog Line Crossing Enough To Justify Stop

Cudmore stopped Snow's vehicle for crossing the fog line, one-time, in violation of the "practicable lane statute."[16] Snow insists that Cudmore's traffic stop was inadequately based on "a single crossing of a lane line."[17]

Cudmore testified that Snow's vehicle "went clear outside of the fog line onto the shoulder [before] it jerked back into its lane."[18] He clarified that her car was "probably two tire widths" over the fog line.[19] And he said that the driving aberration occurred on

---

[12] *United States v. Rutledge*, 61 F.4th 597, 601 (8th Cir. 2023) (citations omitted) (internal quotations omitted).
[13] *United States v. Mosley*, 878 F.3d 246, 251 (8th Cir. 2017).
[14] *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).
[15] *INS v. Delgado*, 466 U.S. 210, 217 (1984).
[16] *See* Suppr. Hr'g Tr. 13-14, 39; S.D. Codified Laws § 32-26-6 ("On a roadway divided into lanes, a vehicle shall be driven as nearly as practicable entirely within a single lane and may not be moved from such lane until the driver has first ascertained that such movement can be made safely.").
[17] Docket No. 25 at 4.
[18] Suppr. Hr'g Tr. 13.
[19] *Id.* at 35, 52.

a straightaway, when there was no oncoming traffic[20] and it was not raining.[21] Cudmore's observation of Snow's "practicable lane" violation was enough to give him probable cause for the stop.[22]

In *State v. Hett*,[23] the South Dakota Supreme Court affirmed a lower court's determination that there was "reasonable and articulable suspicion [the defendant] had violated the practicable lane statute [based on a single instance of] crossing over the fog line."[24] The court's holding rested on the officer's observation of one fog line crossing of "at least a tire width" in a location with "a long, straight stretch of smooth, dry highway with no significant curves or apparent obstructions or barriers in the [vehicle's] lane of travel."[25]

Similarly, the Eighth Circuit held that an officer had probable cause to stop a vehicle for violating South Dakota's practicable lane statute when the passenger side wheels of the vehicle crossed the fog line one time.[26] And other courts, applying statutes much like the one in South Dakota, have held that officers had an objectively reasonable

---

[20] *Id. at* 32.

[21] *Id.* at 31-32.

[22] *See United States v. Herrera Martinez*, 354 F.3d 932, 934 (8th Cir. 2004) (per curiam) (upholding traffic stop based on single instance of vehicle crossing fog line in violation of South Dakota practicable lane statute), *vacated on other grounds*, 549 U.S. 1164 (2007); *United States v. Carrasco-Ruiz*, 587 F. Supp. 2d 1089, 1099 (D.S.D. 2008) ("in South Dakota crossing the fog line is a violation of [practicable lane statute]" that provides probable cause for traffic stop); *see also United States v. Herrera-Gonzales*, 474 F.3d 1105, 1107 (8th Cir. 2007) (affirming vehicle stop premised on officer's observation of vehicle crossing fog line once for 10-15 seconds under practicable lane statute similar to South Dakota's).

[23] 834 N.W. 317.

[24] *Id.* at 323.

[25] *Id.*

[26] *Herrera Martinez*, 354 F.3d at 933-34.

basis to stop a person (1) who crossed the fog line once by "about a foot... for a few seconds" when no factors made it impractical for him to remain in a single lane,[27] and (2) when the right wheels of an individual's car went over the fog line once for two seconds and it was practicable for him to remain within his lane.[28]

Snow's movements—across the fog line to the shoulder and back—were at least as stark as courts that have approved stops under practicable lane laws like South Dakota's. Her irregular driving engendered reason to suspect she had committed an infringement of the state lane law.

### B. Stop Supported By Other Circumstances

Even if Snow's solitary fog line crossing and shoulder driving are deemed insufficient to support the stop of her car, there is additional evidence in the record to justify the stop.[29] Aside from the lane departure and return, Cudmore considered that (1) someone had just reported a blue vehicle, with out-of-state plates, was "all over the road"; and (2) the vehicle was travelling 40 mph in a 65 mph zone and weaving within its lane.[30] Cudmore thought the driver of the vehicle might be intoxicated or impaired.[31] His dash camera also reflects a dangling mirror and a badly damaged one on either side of Snow's

---

[27] *United States v. Alvarado*, 430 F.3d 1305, 1308–09 (10th Cir. 2005).
[28] *State v. Wolfer*, 780 N.W.2d 650, 652–53 (N.D. 2010).
[29] *See Hett*, 834 N.W.2d at 323.
[30] Suppr. Hr'g Tr. 12, 46.
[31] *Id*. at 11, 13-14.

car.[32] These equipment dilapidations and the safety concerns they created, the report Cudmore received, and his own observations (including the sudden "jerk" of the car from the shoulder back to the roadway[33]) combined to provide reasonable suspicion for the stop.[34]

### C. Any Mistake Was Reasonable And Did Not Invalidate Stop

In any event, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'"[35] "To be reasonable is not to be perfect, and the [] Amendment allows some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law and the community's protection.'"[36] The Supreme Court has recognized that seizures based on mistakes of fact can be reasonable.[37] And the Court has done so for mistakes of law, including ones made in the context of an investigatory stop of a vehicle for a traffic violation.[38]

The real question at this stage is not whether Cudmore erred in interpreting the state "practicable lane" statute and believing that Snow had violated it, but whether he so obviously erred that no objectively reasonable officer could have reached the same conclusion he did at the time of the stop. Stated differently and more succinctly, was it

---

[32] *See* Suppr. Hr'g Ex. 1 (Nov. 9, 2023); *see also* Suppr. Hr'g Tr. 50 (Cudmore's testimony that broken or inoperable mirrors are an equipment violation).

[33] Suppr. Hr'g Tr. 13-14, 35, 52.

[34] *See Hett*, 834 N.W.2d at 323.

[35] *Lange v. California*, 141 S.Ct. 2011, 2017 (2021).

[36] *Heien v. North Carolina*, 574 U.S. 54, 60-61 (2014) (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

[37] *Id.* at 61.

[38] *Id.* at 62-68.

reasonable for Cudmore to suspect that Snow's driving was illegal? If so, then there was no violation of the Fourth Amendment.

"It is well established that mistakes of law or fact, if objectively reasonable, may still justify a valid stop."[39] The Eighth Circuit has consistently upheld traffic stops where "an expert defense attorney, and even a federal judge, ultimately might conclude that the plain language of the [statute] technically requires" a different legal conclusion than that reached by officers in the field.[40]

So even if Cudmore was wrong about whether the "practicable lane" statute was infringed by Snow's lane and shoulder exchange, his error of law was reasonable. He should not be expected to interpret a statute with the subtlety and expertise of a judge or lawyer but only be able to comprehend and apply it in an objectively reasonable manner.

---

[39] *Rutledge*, 61 F.4th at 602 (citation omitted); *see also United States v. Martin*, 411 F.3d 998, 1002 (8th Cir. 2005) ("[A] misunderstanding of traffic laws, if reasonable, need not invalidate a stop made on that basis."); *State v. Lerma*, 884 N.W.2d 749, 752 (S.D. 2016) (objectively reasonable for officer to believe that defendant's inoperative left brake light violated law so as to provide suspicion necessary to make traffic stop reasonable under Fourth Amendment).

[40] *United States v. Rodriguez-Lopez*, 444 F.3d 1020, 1022-23 (8th Cir. 2006); *Martin*, 411 F.3d at 1001–02; *Herrera Martinez*, 354 F.3d at 934; *see also Heien*, 574 U.S. at 67-68 (because it was objectively reasonable for officer to think that defendant's faulty right brake light breached state law, there was reasonable suspicion to justify stop); *United States v. Bowers*, 678 Fed. Appx. 460, 461 (8th Cir. 2017) (reasonable suspicion can be based on objectively reasonable mistake of law); *United States v. Gadson*, 670 Fed. Appx. 907, 909 (8th Cir. 2016) (even if officer mistaken in belief that signaling was required before exiting traffic circle, error of law was reasonable; objectively reasonable officer could have believed that defendant required to use turn signal); *United States v. Hastings*, 685 F.3d 724, 727-28 (8th Cir. 2012) (declining to decide whether motorist's conduct "in fact" violated state law "because it was objectively reasonable for [officer] to conclude that it did"); *United States v. Sanders*, 196 F.3d 910, 913 (8th Cir. 1999) (refusing "to parse the words of [a] statute in deciding whether [officer] had probable cause to stop the vehicle" because he had objectively reasonable basis for believing motorist breached traffic law whether or not actual violation existed); *Lerma*, 884 N.W.2d at 751–52 (officer's belief that applicable statute required all brake lights (however many) be operable, as justification for initiating traffic stop, was objectively reasonable mistake of law).

9

Given the state of the law at that time (and now) and the evidence, any mistake of law Cudmore may have made did not render the stop unlawful and contravene the Fourth Amendment.

## II.    Prolonged Detention

Snow next claims that Cudmore did not have reasonable suspicion to expand the traffic stop.[41] She says that officers extended the stop beyond the time necessary to complete its purpose.[42] As a result, she maintains, the evidence found in her vehicle became the fruit of an unconstitutional search and seizure and should be suppressed.[43] The government asserts that Reede's K-9 deployment occurred during the stop and before he wrote Snow a ticket for her lane violation.[44] And even if the stop were prolonged, the government argues, Snow's outstanding warrant, the damage to her car, and observations Cudmore and Reede made on scene permitted the detention of her.[45]

A stop premised only on an observed traffic violation becomes unlawful when drawn out longer than reasonably necessary "to complete the mission" of issuing the ticket.[46] The mission typically includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance," as necessary to ensure that "vehicles

---

[41] Docket No. 25 at 4-6.
[42] *Id.* at 5-6.
[43] *Id.* at 3, 5-6.
[44] Docket No. 29 at 8.
[45] *Id.* at 6-9.
[46] *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

on the road are operating safely and responsibly."[47] Certain inquiries unrelated to the violation are allowed so long as they do not prolong the stop.[48] Once the violation is addressed, or reasonably should have been addressed, the stop and inquiries must terminate.[49] But a stop, may be expanded beyond its original "mission" when officers have reasonable suspicion of other criminal activity afoot.[50] And officers *may* extend a traffic stop for a drug dog to arrive if, during the stop, they develop reasonable suspicion that evidence of a drug crime is concealed in the vehicle.[51]

### A. Stop Not Extended

After seeing the lane violation, Cudmore stopped Snow's vehicle.[52] Reede joined Cudmore on the scene soon after the stop.[53]

As they approached the car, Cudmore and Reede noticed that both outside mirrors were broken, the passenger side mirror was "hanging down along the vehicle," and there was fresh damage to the front bumper and one of the quarter panels.[54]

---

[47] *Rodriguez v. United States*, 575 U.S. 348, 355 (2015).

[48] *Id.*

[49] *Id.*

[50] *United States v. Davis*, 943 F.3d 1129, 1132 (8th Cir. 2019) (citing *United States v. Riley*, 684 F.3d 758, 763, 765 (8th Cir. 2012)); *see also Rutledge*, 61 F.4th at 602 (officers can prolong traffic stop until drug dog arrives if during stop officers develop reasonable suspicion that evidence of drug crime is concealed in vehicle).

[51] *Rutledge*, 61 F.4th at 602 (citing *United States v. Suitt*, 569 F.3d 867, 870 (8th Cir. 2009)).

[52] Suppr. Hr'g Tr. 14.

[53] *Id.* at 19 ("Sergeant Reede was right behind me when we pulled the vehicle over . . . but when he got there, he had come up while I was still in the first stages of contacting Ms. [Snow]."); *see also id.* at 21 (Reede and Cudmore's initial approach of Snow's vehicle not recorded on Cudmore's dash camera).

[54] *Id.* at 15, 49-50, 59.

Snow identified herself from inside the car and Cudmore asked to see her driver's license, insurance, and registration.[55] As Snow reached in the glove box, Cudmore saw several, what appeared to be, needle marks on her arms, consistent with drug use.[56] She ultimately produced the requested documents and gave them to Cudmore.[57]

After a conversation with Cudmore, Reede went to his house—two miles away—to get his drug dog, Rowdy.[58] Reede returned about six to eight minutes later.[59]

Contemporaneously, Cudmore had dispatch run a license check on Snow.[60] Dispatch advised him that she had an outstanding warrant from California.[61] Cudmore requested dispatch to confirm the warrant and find out if California wanted her held.[62] While waiting to hear back from dispatch, Cudmore asked Snow where she was headed.[63] Snow responded that she was travelling from California to Wahpeton, North Dakota, which she incorrectly pronounced "Wheapaton."[64] Cudmore told her that if Wahpeton was her destination, she was going the wrong way.[65] Snow thought she was in North

---

[55] *Id.* at 15-16.

[56] *Id.* at 16-17, 20, 38.

[57] *Id.* at 17, 51.

[58] *Id.* at 20, 59-61.

[59] *Id.* at 61.

[60] *Id.* at 17.

[61] *Id.* at 18.

[62] *Id.* at 18, 20-21; Suppr. Hr'g Ex. 1 at 2:32-2:36.

[63] Suppr. Hr'g Tr. 18.

[64] *Id.* at 18, 48.

[65] *Id.* at 19 ("She was headed westbound on 212 and the quickest way to Wahpeton is going east on 212 to Watertown and then north on Interstate 29.").

Dakota and did not even realize that she was still in South Dakota.[66] She also did not have

any luggage in her car, at least that Cudmore could see. [67]

Upon arrival, Reede deployed Rowdy around Snow's Mustang.[68] Rowdy alerted

to a drug odor coming from inside it. [69] Cudmore and Reede then searched the car,[70] ten

minutes after the stop.[71] Several minutes later, dispatch confirmed the warrant but said

that it "would have to check with the [district attorney's office in California] to see if they

will extradite [Snow]."[72] Cudmore did not hear back from the California authorities about

Snow until sometime after her arrest.[73]

Cudmore's "mission" was to issue Snow a ticket for her practicable lane statute

violation. His mission also included checking her driver's license, determining whether

she had any outstanding warrants, and ensuring that her vehicle could operate safely.[74]

---

[66] *Id.* at 19 (Q: "[D]id she know she was in South Dakota?" A: "No." Q: "Did she know where she was at all?" A: "She thought she was in North Dakota.").

[67] *Id.* at 48.

[68] *Id.* at 62; Suppr. Hr'g Ex. 1 at 6:38-6:45.

[69] Suppr. Hr'g Tr. 77-78 (Q: "I've paused [Exhibit 1] at 7 minutes, 19 seconds. What have we seen to this point . . . ." A: "[T]here's alert behavior at the . . . back bottom corner of the driver door."); Suppr. Hr'g Ex. 1 at 7:05-8:35.

[70] Suppr. Hr'g Tr. 26.

[71] Suppr. Hr'g Tr. 52-53 (Q: "[H]ow much time from when you stopped the vehicle and approached Ms. Snow until you . . . began your search of that vehicle?" A: "I would say approximately 10 minutes.").

[72] Suppr. Hr'g Ex. 1 at 19:20-19:30; Suppr. Hr'g Tr. 47.

[73] *Id.* at 49.

[74] *Rodriguez,* 575 U.S. at 355; *see also United States v. Roberts,* 687 F.3d 1096, 1100 (8th Cir. 2012) (stop not prolonged by officer's investigation into passenger's warrant status).

The search of Snow's car occurred about ten minutes after Cudmore pulled her over and before the stop's mission had been completed.[75]

When dispatch verified the existence of the California arrest warrant, Cudmore's mission evolved: he had to determine whether to arrest and hold Snow on the warrant. He never heard from California (perhaps because of the early morning hour) until well after Rowdy's alert, the vehicle search, and Snow's arrest.[76] Cudmore was thus still completing the purpose of the stop when Rowdy arrived, alerted, and officers searched Snow's car.[77]

The extensive damage to Snow's vehicle expanded the mission of the stop as well because officers must "ensur[e] that vehicles on the road are operated safely and responsibly."[78] The "busted" driver side mirror and the hanging mirror on the passenger side[79] reduced Snow's ability to effectively operate her vehicle. And the "fresh" damage to the front bumper and quarter panel of her car[80] (suggestive of a recent mishap) may have done so too, considering the speed (40-mph in a 65-mph zone[81]) at which she was traveling. The damage to the car put Snow and other motorists at risk and broadened the purpose, or mission, of the stop.

---

[75] *See Rutledge*, 61 F.4th at 603 (stop was not prolonged when ten minutes elapsed between stop of vehicle and K-9's arrival and alert).
[76] Suppr. Hr'g Tr. 48-49.
[77] *See Rutledge*, 61 F.4th at 603 (citation omitted).
[78] *Rodriguez*, 575 U.S. at 349 (citing *Delaware v. Prouse,* 440 U.S. 648, 658–59 (1977)).
[79] Suppr. Hr'g Tr. 49-50, 59.
[80] *Id.* at 59.
[81] *Id.* at 12.

**B. Reasonable Suspicion Of Drug Crime Evidence In Vehicle**

Officers may prolong a stop for a drug dog to arrive if they have reasonable suspicion that there is evidence of a drug crime concealed in the vehicle.[82] The many sores on Snow's arms suggested that she was a frequent drug user.[83] So did her "nervous" and "fidgety" behavior, which Cudmore and Reede both noticed.[84] Reede decided to go get Rowdy based on Snow's behavior.[85] Snow said she was going to Wahpeton, calling it "Wheapaton," but was 350 miles away and headed in the opposite direction when Cudmore stopped her.[86] And Cudmore did not see any luggage in the car, something a long-distance traveler like Snow would expect to have in her car. Together, these circumstances provided Cudmore and Reede with at least reasonable suspicion to believe that Snow's vehicle had evidence of a drug crime in it and gave officers a legal basis for extending the stop.[87]

---

[82] *Rutledge*, 61 F.4th at 602.

[83] Suppr. Hr'g Tr. 16-17.

[84] *Id.* at 17, 20, 59, 73-74.

[85] *Id.* at 59-61.

[86] *Id.* at 18-19; *see also Suitt*, 569 F.3d at 869, 872 (defendant's answer—that he was heading to Ohio, but could not name the city—provided reasonable suspicion to prolong traffic stop).

[87] *See Suitt*, 569 F.3d at 869, 872.

III.    **Automobile Exception**

Snow lastly claims that Cudmore and Reede lacked probable cause to search her vehicle.[88] She contends that Rowdy's purported alert behavior could not establish probable cause because it was subjective, ambiguous, and unreliable.[89] She also maintains that the "integrity" of Rowdy's sniff was "compromised" by the two dogs in the car.[90] The search was proper, the government asserts, because Rowdy's alert signaled the presence of drugs in the vehicle and created probable cause.[91]

During a lawful traffic stop, a warrantless automobile search is permissible when there is probable cause to believe that a vehicle contains contraband or evidence of a crime.[92] An officer with probable cause to search a vehicle may search every part of the vehicle and its contents, including items belonging to the driver, a passenger, or someone else.[93]

---

[88] Docket No. 24.

[89] Docket No. 25 at 3, 6-7, 38 at 1, 3-8.

[90] Docket Nos. 25 at 7, 38 at 7-8.

[91] Docket Nos. 29 at 9-10, 41 at 1-5.

[92] *Carroll v. United States*, 267 U.S. 132, 149 (1925); *United States v. Williams*, 955 F.3d 734, 737 (8th Cir. 2020).

[93] *See Wyoming v. Houghton*, 526 U.S. 295, 300-07 (1999); *United States v. Ross*, 456 U.S. 798, 823-25 (1982).

"[A]n alert or indication[94] by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person or for the search of a vehicle."[95] "A drug detection dog is considered reliable when it has been 'trained and certified to detect drugs.'"[96] "If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search."[97] The ultimate question though—similar to every inquiry into probable cause—is "whether all the facts surrounding the dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime."[98]

"The sufficiency of a drug dog's alert must be construed with the same 'flexible, common-sense standard' as probable cause."[99] Whether the dog's alert is reliable, for

---

[94] *United States v. Rederick*, No. 4:20-CR-40066-KES, 2021 WL 5547702, at *6 (D.S.D. June 25, 2021) (defining "alert" and "indication" and explaining difference between them. Alert is innate behavior dog exhibits that handler interprets, such as change in body posture, respiration, and tail wagging. It is not taught and is dog's natural way of signaling. Indication is trained behavior dog exhibits when he recognizes odor he is trained to detect, such as sitting or lying down, or barking), *report and recommendation adopted,* 2021 WL 4772222 (D.S.D. Oct. 13, 2021), *aff'd,* 65 F.4th 961 (8th Cir. 2023), *cert. denied,* No. 23-5302, 2023 WL 6378953 (U.S. Oct. 2, 2023); Suppr. Hr'g Tr. 65-67, 75, 88 (indication is trained behavior; alert is untrained response); *see also United States v. Salgado,* 761 F.3d 861, 864 (8th Cir. 2014) (referencing trooper's testimony that "an 'alert' is a change in the dog's breathing pattern, while an 'indication' is a more concrete signal that the dog has detected a particular odor"); *United States v. Holleman,* 743 F.3d 1152, 1156 n.3 (8th Cir. 2014) (an "'alert' occurs when a dog detects the odor of the drugs he is trained to locate" while an "'indication' occurs when a dog identifies the location of the strongest source of the drug odor").

[95] *Rederick,* 65 F.4th at 967; *see also Florida v. Harris,* 568 U.S. 237, 246 (2013) ("[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert."); *United States v. McClelland,* No. CR17-40029, 2017 WL 5158682, at *6-9 (D.S.D. Nov. 6, 2017) (discussing drug and hunting dogs, alerts and indications, and when dog signals are reliable).

[96] *Rederick,* 65 F.4th at 967 (citations omitted).

[97] *Harris,* 568 U.S. at 246-47.

[98] *Id.* at 248.

[99] *Rederick,* 65 F.4th at 968 (citing *Harris,* 568 U.S. at 240).

17

purposes of determining probable cause, does not depend on satisfaction of some set of evidentiary requirements or checklist items.[100]

### A. K-9 Alert Sufficient To Support Vehicle Search

Reede initially had Rowdy do a "free pass" around Snow's vehicle.[101] Rowdy did not indicate or alert during the pass.[102] Reede then did another pass around Snow's vehicle with Rowdy, but this time Reede pointed Rowdy to sniff near the car's door seams.[103] On the second pass, Rowdy alerted to the bottom corner of the driver's door.[104] Rowdy also alerted to the passenger door by sticking his head underneath it, going to the rear of the car, and returning to the door.[105] During the third pass around the car, Rowdy climbed the driver's door seam and put his front paws on the windows above it.[106] Reede testified this was alert behavior.[107] Convinced he had positive alerts of drug odor coming from Snow's vehicle, Reede put Rowdy away and informed Cudmore of the alert.[108]

When asked about why Rowdy would alert on her car, Snow volunteered that there may be some marijuana (an ounce or less) in the vehicle.[109] Based on the alerts and

---

[100] *Harris*, 568 U.S. at 245, 248; *Rederick*, 65 F.4th at 968-69.
[101] *See* Suppr. Hr'g Ex. 1 at 6:40-7:05; Suppr. Hr'g Tr. 63 (A: "At that point, I'm letting him do basically a free pass is what we call it." Q: "Can you describe the point of a free pass?" A: "A free pass is just to . . . let him try to do it on his own without showing him where to . . . sniff.").
[102] Suppr. Hr'g Tr. 76-77.
[103] *Id.* at 64, 77-78.
[104] *See* Suppr. Hr'g Ex. 1 at 7:15-7:20; Suppr. Hr'g Tr. 64-65, 77-79.
[105] Suppr. Hr'g Ex. 1 at 7:30-7:50; Suppr. Hr'g Tr. 68, 79-80.
[106] Suppr. Hr'g Ex. 1 at 8:05-8:35; Suppr. Hr'g Tr. 67, 81.
[107] Suppr. Hr'g Tr. 69, 81.
[108] Suppr. Hr'g Ex. 1 at 8:35-8:40; Suppr. Hr'g Tr. 69-71.
[109] Suppr. Hr'g Tr. 28, 70.

Snow's statements, Cudmore and Reede searched the car (after removing her dogs from inside it).[110] Snow did not consent to the search.[111] On the rear floor board, between the driver and passenger seats, Reede found a plastic bag with a large amount of methamphetamine in it.[112]

Having considered the dash camera footage and Reede's credible testimony through a common sense lens, the Court finds that Rowdy was reliable and that his alerts provided probable cause to search Snow's car.[113] Rowdy did not appear distracted by her dogs[114] and had been deployed in traffic stops before—and not alerted—when canines were in the vehicle.[115] What's more, Rowdy was certified to detect methamphetamine, cocaine, heroin, mushrooms, and ecstasy,[116] continually passed monthly training exercises,[117] and did exceptionally well in real world situations.[118] Reede described Rowdy's alert behavior and the camera footage corroborates that behavior along the

---

[110] *Id.* at 28-29, 71-72.

[111] *Id.* at 71.

[112] *Id.* at 26-27, 72.

[113] *See Rederick*, 65 F.4th at 968-69 (reliable drug dog's alert behavior—changing his breathing and tail wagging pace—provided probable cause to search vehicles); *United States v. Tuton*, 893 F.3d 562, 570 (8th Cir. 2018) (dog sniff leading to alert to car, standing alone, gave officer probable cause to believe drugs present); *Holleman*, 743 F.3d at 1157 (dog's alert reliable enough to provide probable cause even though dog failed to display "full indication").

[114] Suppr. Hr'g Tr. 69, 90-92.

[115] *Id.* at 90; *see also* Suppr. Hr'g Tr. 57, 85, 90 (Rowdy "proofed off" of dog odors and trained not to pay any attention to them).

[116] *Id.* at 56.

[117] *Id.* at 93-94.

[118] *Id.* at 92.

driver and passenger doors.[119] Contrary to what Snow claims, Rowdy's alerts were

objective and recognizable enough to be reliable.[120] He pulled Reede back to the driver

door and stood up at the door scratching the top seams of it.[121] And Rowdy put his head

under the passenger door and quickly returned to the door.[122] His alerts were definitive

and profound[123] and showed he had much more than an "interest" in the door seams.[124]

After evaluating all the evidence, the Court is satisfied that Rowdy's alerts were "up to

snuff."[125]

## B. Statements About Marijuana In Vehicle

But even if Rowdy's alert behavior, by itself, was not enough to support the search,

Snow's comments about the presence of marijuana in the car[126]—when considered with

---

[119] *Id.* at 66, 88-89; Suppr. Hr'g Ex. 1 at 7:00-8:40; *see also Rederick*, 65 F.4th at 968 (dog changing his breathing and wagging his tail faster at both doors of vehicle was valid alert supporting probable cause to search vehicle).

[120] *Compare Tuton*, 893 F.3d at 571 ("repeated profound alert") and *Holleman*, 743 F.3d at 1157 ("definitive alerts") *with United States v. Heir*, 107 F. Supp. 2d 1088, 1091 (D. Neb. 2000) ("subtle" alert behavior that "might only be recognized by" a person familiar with that dog).

[121] Suppr. Hr'g Ex. 1 at 8:15-8:35; Suppr. Hr'g Tr. 67-68.

[122] Suppr. Hr'g Ex. 1 at 7:30-7:40; Suppr. Hr'g Tr. 68-69, 79-80.

[123] *See Tuton*, 893 F.3d at 567, 571 (trained drug dog's "profound alert" to luggage compartment of bus sufficient to provide probable cause for search of bags in compartment); *Holleman*, 743 F.3d at 1156-57 (certified dog's "two definitive" alerts, while not "full" indication, enough to establish probable cause for vehicle search); *see also Rederick*, 65 F.3d at 968-69 (dog's change in breathing and tail wag speed sufficient alert to give troopers probable cause to search vehicles); *United States v. Jackson*, 811 F.3d 1049, 1052 (8th Cir. 2016) ("positive alert" by a reliable dog alone established probable cause"); *United States v. Bordeaux*, No. CR14-30067-RAL, 2014 WL 6462006, at *6-7 & n.3 (D.S.D. Nov. 17, 2014) (dog reliable and alert behavior of stopping and freezing at driver side window twice enough for probable cause search of vehicle).

[124] *See and compare Holleman*, 743 F.3d at 1156-57 (drug dog's alerts more than mere interest in vehicle) *with United v. Jacobs*, 886 F.2d 1231, 1233, 1235 (8th Cir. 1993) (dog who pushed package around and sniffed it twice merely showed interest in it).

[125] *Harris*, 568 U.S. at 248.

[126] Suppr. Hr'g Tr. 28, 70.

the behavior—were sufficient to establish probable cause.[127] They made up for any short fall in Rowdy's drug odor signaling.

## CONCLUSION

Snow's lane departure, along with her (1) jerky and reported "all over the road" driving, (2) dawdling speed, and (3) equipment issues, gave Cudmore the cause, or at least the suspicion, he needed to stop her car. And even if his stop were based on a mistaken understanding of the practicable lane statute, the stop was valid because any such mistake was reasonable.

Because Cudmore and Reede were still engaged in their traffic stop mission when Rowdy alerted on Snow's vehicle, the stop was not prolonged. But if it was, the stop was still valid because Cudmore had reasonable suspicion that the vehicle contained evidence of a drug crime based on the sores on Snow's arms, her erratic driving, lack of awareness of where she was, and nervous, fidgety behavior.

Rowdy's alerts on the driver and passenger side doors of Snow's car provided Cudmore and Reede with probable cause to search the vehicle. As did her admission

---

[127] *See Holleman*, 743 F.3d at 1156-58 (drug dog's two alerts to vehicle, when considered with other suspicious circumstances, provided probable cause to search vehicle); *United States v. Farlee*, 427 F. Supp. 3d 1123, 1129 (D.S.D. 2019) (dog's alert, along with information that defendant was methamphetamine user, gave officers probable cause to believe truck contained illegal drugs); *United States v. Barraza-Maldonado*, No. 12-CR-0054 (PJS/SER), 2012 WL 3230494, at *3 (D. Minn. Aug. 6, 2012) (dog's alert, when combined with other cited evidence, provided grounds for reasonable person to believe there was "fair probability" drugs would be in vehicle), *aff'd*, 732 F.3d 865 (8th Cir. 2013).

(about marijuana being in the car), which strengthened the probable cause from the alerts and gave officers an independent basis for the search.

## RECOMMENDATION

In accordance with the authorities and legal analysis set forth in this report, and the record now before the Court, it is

RECOMMENDED that Snow's motion to suppress,[128] and supplement to it,[129] be denied.

## NOTICE

The parties have 14 calendar days after service of this report and recommendation to object to the same.[130] Unless an extension of time for cause is later obtained,[131] failure to file timely objections will result in the waiver of the right to appeal questions of fact.[132] Objections must "identify[] those issues on which further review is desired[.]"[133]

DATED this 8th day of December, 2023.

**BY THE COURT:**

**MARK A. MORENO**
**UNITED STATES MAGISTRATE JUDGE**

---

[128] Docket No. 24.

[129] Docket No. 38.

[130] *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b).

[131] *See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (citing *Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

[132] *See Thompson*, 897 F.2d at 357; *Nash*, 781 at 667.

[133] *Arn*, 474 U.S. at 155.