UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JUSTINA LYNN COSTA, a/k/a Justina Snow,<br><br>Defendant. | 3:23-CR-30092-RAL<br><br>OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION AND DENYING MOTION TO SUPPRESS |

Defendant Justina Lynn Costa ("Costa"), a/k/a Justina Snow, was indicted for possession with the intent to distribute a controlled substance after police found a plastic bag containing methamphetamine in her car. Costa moved to suppress the methamphetamine, Doc. 24, arguing that (1) the police officers did not have a legitimate basis to make a traffic stop, (2) the police unreasonably prolonged the stop to search her vehicle, and (3) the police lacked probable cause to search her vehicle. See Doc. 25, 38, 43.

This Court referred Costa's motion to Magistrate Judge Mark A. Moreno under 28 U.S.C. § 636(b)(1)(B). After holding an evidentiary hearing, Magistrate Judge Moreno entered a Report and Recommendation for Disposition of the Motion to Suppress recommending denial of the motion on all three grounds. See Doc. 21, 22. Costa objected to the Report and Recommendation's legal conclusion on each issue. See Doc. 43 at 1, 7, 9.[1] A district court reviews a report and

---

[1] This Court will cite documents filed within CM/ECF as "Doc."; the suppression hearing transcript will be cited as "ST"; and exhibits admitted during the suppression hearing will be cited as "Ex."

1

recommendation under the standards provided in 28 U.S.C. § 636(b)(1), which states that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. [The district] judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."

I. **Background**

Around 7:45 a.m. on June 15, 2023, Ziebach County Sheriff Gary Cudmore ("Cudmore") received a report from Cheyenne River Tribal Dispatch that a blue car with out-of-state license plates was weaving all over the road as it headed west on U.S. Highway 212 outside Eagle Butte, South Dakota. ST at 9–10. Cudmore responded to the call. Id. at 10. While heading east on Highway 212 from Dupree toward Eagle Butte, Cudmore spotted a blue Ford Mustang with out-of-state plates matching the description from tribal dispatch. Id. at 11. Cudmore turned around to follow the Mustang. Id. at 11–12. As he began following the Mustang, Cudmore talked with Sergeant Jeremy Reede ("Reede"), an officer for the Cheyenne River Sioux Tribe, and informed him about the ongoing situation. Id. at 12. After talking with Cudmore, Reede responded to render assistance. Id. at 58.

Once Cudmore caught up with the Mustang, he observed that it was driving 40 miles per hour (mph) on a highway with a 65-mph speed limit, id., despite clear, dry roads, see Ex. 1; ST at 31–32. He also observed the car weaving back and forth between the yellow center line and white fog line, although crossing neither at that time. See ST at 13. At one point, however, Cudmore witnessed the Mustang cross "clear outside of the fog line onto the shoulder" before "it jerked back into its lane," all occurring on a straight road without any oncoming traffic. Id. Cudmore then activated his emergency lights and conducted the underlying traffic stop. Id. at 14.

2

Cudmore approached the Mustang and spoke with Costa,[2] the driver and sole occupant of the vehicle, aside from her two dogs, Biggie and Smalls. Id. at 16, 81. Reede arrived on scene shortly after Cudmore and ultimately joined him at the Mustang while he was talking with Costa. See id. at 19, 59. Cudmore requested Costa's license, insurance, and registration. Id. at 17. As she retrieved her insurance and registration forms from the glove box, Cudmore observed what he described as "meth mites"—sores from paranoia related scratching—and needle marks on her arms indicative of methamphetamine use. Id. Reede also noticed behavior consistent with drug use, such as Costa being "overly anxious and nervous." Id. at 60. These circumstances prompted Reede to retrieve his drug sniffing canine, Rowdy, who was kenneled in Dupree, two miles away, a trip that took about six to eight minutes. See id. at 60–61. In the time that it took Reede to retrieve Rowdy, Cudmore returned to his car and requested dispatch to run checks on Costa's name, license, and registration. Id. at 17. Dispatch advised Cudmore that Costa had an outstanding warrant from California for failing to appear. Id. at 18. Cudmore asked dispatch to verify the warrant and inquire into whether California wanted Costa held for extradition. Id. While Cudmore waited for dispatch to verify the warrant and obtain instructions on extradition, Reede had returned to the traffic stop with Rowdy. See Ex. 1 at 00:02:05–00:19:20.

Reede then deployed Rowdy for a drug detection sniff. See Ex. 1 at 00:06:41; ST at 63. While sniffing around the car, especially near the seams of the driver's and passenger's doors, Rowdy's behavior changed: he focused more heavily on the seams of the two front car doors, ducking his head under the car, jumping up on the door to follow the scent higher up the seam, and

---

[2] As reflected in Cudmore's testimony at the suppression hearing, Justina Costa identified herself to police as Justina Snow, her preferred name. ST at 16. However, this Court will use "Costa" throughout the opinion and order because it is consistent with the principal name used in her Indictment.

chambering air. ST at 68–69. Reede understood Rowdy's alert behavior to provide probable cause to search Costa's Mustang. Id. at 69–70. Upon searching the Mustang, Reede found a plastic baggie containing methamphetamine. Id. at 72. It was not until after Cudmore and Reede finished searching the Mustang that dispatch confirmed the warrant. Even then, dispatch was still waiting to hear whether California wanted Costa held for extradition, information California did not provide until after Cudmore had transported Costa to the Meade County Jail for possession of methamphetamine. Id. at 30–31.

## II. Discussion

### A. The Traffic Stop was Justified.

Costa objects to Judge Moreno's legal conclusion that the traffic stop was justified at its inception, arguing that a single instance of crossing over the white fog line does not violate SDCL § 32-26-6, South Dakota's practicable lane statute.[3] Doc. 43 at 1–2. Costa contends that the traffic stop was an unreasonable seizure under the Fourth Amendment because SDCL § 32-26-6 does not strictly prohibit crossing a roadway's center or fog line, so long as the totality of circumstances show that the vehicle's movement was not endangering other drivers. Id. at 2–4.

A traffic stop is a "seizure" under the Fourth Amendment and must be supported by probable cause or reasonable suspicion. United States v. Gordon, 741 F.3d 872, 876 (8th Cir. 2013). Probable cause for a traffic stop exists "as long as an officer objectively has a reasonable basis for believing that the driver has breached a traffic law." Id. (cleaned up and citation omitted). This is true even when the traffic violation is minor, and the stop is simply "a pretext for other

---

[3] The practicable lane statute provides, "On a roadway divided into lanes, a vehicle shall be driven as nearly as practicable entirely within a single lane and may not be moved from such lane until the driver has first ascertained that such movement can be made with safety. A violation of this section is a Class 2 misdemeanor." SDCL § 32-26-6.

investigation." United States v. Payne, 534 F.3d 948, 951 (8th Cir. 2008). The relevant question when reviewing a traffic stop is whether it was objectively reasonable for the officer to believe that a traffic violation had been committed, not whether a traffic violation actually occurred. See United States v. Hastings, 685 F.3d 724, 727–28 (8th Cir. 2012) (explaining that it was unnecessary to determine whether the defendant had actually committed a traffic violation because it was objectively reasonable for the officer to believe that the defendant has done so).

Here, Cudmore, a 32-year law enforcement veteran, responded to a dispatch report that a blue vehicle with out-of-state plates was "driving all over the road." ST at 10. Cudmore identified a blue Ford Mustang matching dispatch's description. Id. at 11–12. Cudmore observed the Mustang driving 25 mph under the posted speed limit, id. at 12, despite clear, dry roads and fair June weather, see Ex. 1. He also observed the car swerving back and forth between the yellow center line and white fog line, although crossing neither at that time. ST at 13. At one point, however, Cudmore witnessed the vehicle cross "clear outside of the fog line onto the shoulder" before "it jerked back into its lane" on a straight portion of road without any oncoming traffic to prompt such a maneuver. Id. at 13. Based on these observations and the details relayed to him by tribal dispatch, Cudmore conducted the underlying traffic stop. Id. at 14.

The totality of circumstances gave Cudmore an objectively reasonable basis for believing that Costa violated South Dakota's practicable lane statute. See id. at 11, 13–14. First, prevailing law allows law enforcement to stop a car under SDCL § 32-26-6 when, as here, the car crossed over the fog line once, the driving conditions were good, and it was practicable for the defendant to remain entirely within his lane. See State v. Hett, 834 N.W.2d 317, 321, 323 (S.D. 2013); United States v. Herrea Martinez, 354 F.3d 932, 935 n.1 (8th Cir. 2004) (per curiam) (referring to SDCL § 32-26-6) vacated on other grounds, 549 U.S. 1164 (2007); see United States v. Carrasco-Ruiz,

5

587 F. Supp. 2d 1089, 1099 (D.S.D. 2008); see generally State v. Magallanes, 824 N.W.2d 696, 701 (Neb. 2012) (citing Herrera Martinez for the proposition that "crossing [the] fog line one time [is] sufficient probable cause to stop [a] vehicle under South Dakota"); United States v. Herrera-Gonzalez, 474 F.3d 1105, 1107 (8th Cir. 2007) (upholding a traffic stop based on an Iowa statute similar to SDCL § 32-26-6 when an officer observed one instance of a driver crossing the fog line for about ten seconds). Second, the pertinent question is not whether a single instance of crossing a fog line does in fact violate § 32-26-6. Given the authority interpreting and applying § 32-26-6, it was objectively reasonable for Cudmore to believe that Costa had committed a traffic violation and execute a traffic stop accordingly. See Hastings, 685 F.3d at 727–28 (determining whether a defendant actually committed a traffic violation is unnecessary when it is objectively reasonable for the officer to believe that the defendant had done so).

Furthermore, Cudmore had reasonable, articulable suspicion that Costa was operating a vehicle while intoxicated. Law enforcement may conduct a traffic stop for investigatory purposes if they have reasonable, articulable suspicion that a crime is being committed. United States v. Lloyd, 36 F.3d 761, 763 (8th Cir. 1994) (citing Terry v. Ohio, 392 U.S. 1, 21 (1968)). "Reasonable suspicion exists when an officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." Gordon, 741 F.3d at 876 (cleaned up and citation omitted). Although reasonable suspicion requires "more than an inchoate hunch, the Fourth Amendment only requires that police articulate some minimal, objective justification." United States v. Tamayo–Baez, 820 F.3d 308, 312 (8th Cir. 2016) (cleaned up and citation omitted). In determining "whether police had the requisite reasonable suspicion," the Court must look at "the totality of circumstances including the

collective knowledge and experience of the officers."[4] United States v. Libby, No. 15–182, 2015 WL 5472760, at *4 (D. Minn. Sep. 16, 2015) (citing United States v. Chhunn, 11 F.3d 107, 110 (8th Cir. 1993)).

At the suppression hearing, Cudmore testified that driving 20–25 mph below the posted speed limit, lane driving (weaving back and forth within a lane), and quick "jerks" to recenter the car within the lane are all factors that indicate impaired driving or intoxication. ST at 10–14. Based on Cudmore's 32 years of experience, these facts, along with the rational inferences from them, support reasonable suspicion that Costa was driving while impaired. Navarette v. California, 572 U.S. 393, 402 (2014) ("[W]e can appropriately recognize certain driving behaviors as sound indicia of drunk driving," including "driving 'all over the road' and 'weaving back and forth'" in one's lane. (citation omitted)); see also Miller v. Page, No. 04-4198, 2005 WL 3557426, at *5 (W.D. Mo. Dec. 28, 2005) ("Slow driving may be an indicia of an impaired driver and it may support probable cause to stop a driver where the slow driving is observed in tandem with other traffic violations."). And Cudmore's decision not to further investigate or cite Costa for impaired driving does not undermine the legality of the stop. See United States v. Garrido, 467 F.3d 971, 978 (6th Cir. 2006) (holding that officers' decision to not issue the defendant a citation after pulling him over for following too closely did "not render the stop unlawful after the fact."); see generally

---

[4] Costa also objected to Magistrate Judge Moreno including dispatch's report that the car was driving "all over the road" as a circumstance supporting the traffic stop because Cudmore did not observe it personally. The law does not require that an officer personally observe all circumstances giving rise to reasonable suspicion or probable cause. See Navarette v. California, 572 U.S. 393, 397–99 (2014). Officers may rely on reports made to law enforcement services when those reports are accurate and reliable. See generally United States v. Wheat, 278 F.3d 722, 737 (8th Cir. 2001) (acknowledging that anonymous tips reporting erratic driving may be sufficient to justify an investigatory stop because an intoxicated driver presents an imminent danger to the public). Costa does not attack the credibility or accuracy of the report, Doc. 43 at 5, and nothing in the record provides cause to question its reliability.

7

United States v. Long, 532 F.3d 791, 795 (8th Cir. 2008) (explaining that a traffic stop "is valid even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot" (cleaned up and citation omitted)).

Accordingly, Costa's objections to the legality of Cudmore's initial traffic stop are overruled. Under prevailing law, it was objectively reasonable for Cudmore to believe that Costa violated SDCL § 32-26-6. He also had reasonable, articulable suspicion that Costa was driving while impaired, thereby justifying an investigatory stop. The discovery and pursuit of greater crimes post hoc does not negate the validity of the stop at its inception.

### B. The Traffic Stop was not Prolonged.

Costa next argues that the traffic stop was unreasonably prolonged. Even "[a] traffic stop supported by probable cause or reasonable suspicion may nonetheless violate the Fourth Amendment if it lasts longer than necessary to effectuate" the mission of the stop. United States v. Navarette, 996 F.3d 870, 874 (8th Cir. 2021); Rodriguez v. United States, 575 U.S. 348, 354 (2015) ("[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission.'"). The mission of a traffic stop is "to address the traffic violation that warranted the stop and attend to related safety concerns." Rodriguez, 575 U.S. at 354 (cleaned up and internal citation omitted). "Beyond determining whether to issue a traffic ticket, an officer's mission [involves] 'ordinary inquiries incident to [the traffic stop],'" including "checking the driver's license, *determining whether there are warrants outstanding against the driver*, and inspecting the automobile's registration and proof of insurance." Id. at 355 (emphasis added and second alteration in original); Navarette, 996 F.3d at 874 (citation omitted). "When complications arise carrying out these tasks, 'police may reasonably detain a driver for a longer duration than when a stop is strictly routine.'" Navarette, 996 F.3d at 874 (quoting United States v. Olivera-

8

Mendez, 484 F.3d 505, 510 (8th Cir. 2007)). Otherwise, "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Rodriguez, 575 U.S. at 354. Costa argues that Cudmore prolonged the traffic stop by waiting for Reede to fetch Rowdy and conduct a drug dog sniff.

Because a drug detection dog is not part of the "ordinary inquiries incident to the traffic stop," a traffic stop cannot be *prolonged* to conduct a dog sniff without reasonable suspicion of ordinary criminal wrongdoing. Id. at 355–56 (cleaned up and citation omitted). But law enforcement may conduct a dog sniff during a lawful, routine traffic stop, even in the absence of reasonable suspicion, so long as the dog sniff does not prolong the traffic stop beyond the time reasonably necessary to complete the stop's mission. United States v. Offord, 788 F. App'x 384, 386 (7th Cir. 2019) (unpublished); see Rodriguez, 575 U.S. at 355 ("An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop.").

In Offord, police conducted a traffic stop on a vehicle driving 15 mph over the speed limit. Offord, 788 F. App'x at 385. The officer requested identification from the vehicles two occupants. Id. The driver provided valid identification, but the passenger had none. Id. The passenger accompanied the officer back to his patrol car, where she provided the officer with identifying information that he could run through his computer. Id. The identification check revealed an outstanding warrant for the passenger on a failure to appear for a possession of a controlled substance charge. Id. The officer radioed for a canine unit and began questioning the passenger about the warrant. Id. The passenger disputed the warrant's validity, so the officer relayed her information to the dispatcher, who confirmed the warrant was valid. Id. The dispatcher also

9

informed the officer that he was within the geographical border to execute the warrant, so the officer handcuffed the passenger and put her in the back of his patrol car. Id.

The officer then spoke to the driver and instructed him to "hang out" until the officer heard whether the passenger can be released on bond. Id. Shortly after, the drug detection dog arrived. Id. The officer began writing the traffic ticket while the drug dog conducted a sniff test. Id. Around the time the officer finished writing the traffic ticket, the drug dog alerted to the odor of drugs in the car. Id. A search of the car revealed drugs and other contraband. Id.

The driver moved to suppress all evidence obtained, arguing that the stop was prolonged beyond the time needed to complete the mission of the stop—writing a speeding ticket. Id. The United States Court of Appeals for the Seventh Circuit disagreed. Id. at 386. The Seventh Circuit held that the stop was not prolonged because the officer was "efficient and diligent in his investigation of [the driver's] speeding violation," and the discovery of the passenger's outstanding warrant "transformed the encounter from a routine traffic stop into one that necessitated additional investigation." Id. The court further reasoned that the officer "had not expanded the scope of the stop" "[i]n the four minutes that passed from [the passenger's] arrest to the drug dog alert" because he "had not yet worked on the speeding citation" after he processed the passenger's warrant. Id. at 387.

Costa's case is factually analogous to Offord. After taking actions ordinary to a routine traffic stop, Cudmore discovered that Costa had an outstanding warrant for failing to appear. Ex. 1 at 00:02:20; see Ex. 2. Cudmore then requested that dispatch confirm the warrant's validity and inquire into whether California wanted to extradite. While Cudmore awaited a response on his warrant inquiry, Reede fetched Rowdy and conducted a sniff test around Costa's car. ST at 24–25, 27. Rowdy alerted to the presence of drug odor in the car, and a subsequent search revealed

marijuana and methamphetamine. Id. at 27. As in Offord, the dog sniff here did not prolong the stop, nor did Cudmore unduly prolong the stop by awaiting word on the California warrant. Cudmore discovered Costa's warrant through "ordinary inquiries incident" to a routine traffic stop, Rodriguez, 575 U.S. at 355, and this complication merited further inquiry, Navarette, 996 F.3d at 874 ("When complications arise carry out these tasks, police may reasonably detain a driver for a longer duration than when a stop is strictly routine." (cleaned up and citation omitted)). The dog sniff began and concluded before Cudmore received verification and extradition instructions on the warrant. Ex. 1; Ex. 2 at 5; see ST at 24–25, 27, 45. Thus, the stop was not prolonged beyond what was reasonably necessary to investigate a complication arising from an ordinary inquiry incident to a routine traffic stop.

### C. Probable Cause existed to Search Costa's Vehicle.

Costa lastly objects to Judge Moreno's recommendation that Cudmore and Reede had probable cause to search her automobile. Costa contends that Rowdy's alerts could not provide Reede and Cudmore with probable cause to search the vehicle because Rowdy's alerts were unreliable, and Rowdy never gave a final, trained indication. Doc. 43 at 9. Costa argues that, absent a final trained indication, untrained alert behavior does not on its own confer probable cause to search an automobile.

The Eighth Circuit has recognized a definitional distinction between a drug dog's "alert" and "indication." United States v. Holleman, 743 F.3d 1152, 1156 n.3 (8th Cir. 2014) (stating that "[a]n 'alert' occurs when a dog detects the odor of the drugs he is trained to locate," while "[a]n 'indication' occurs when a dog identifies the location of the strongest source of the drug odor"); see United States v. Salgado, 761 F.3d 861, 864 (8th Cir. 2014) (recounting officer's testimony that "an 'alert' is a change in the dog's breathing pattern, while an 'indication' is a more concrete

signal that the dog has detected a particular odor"). Yet in "Holleman, [the Eighth Circuit] rejected the contention that a final indication is required to establish probable cause." United States v. Tuton, 893 F.3d 562, 571 (8th Cir. 2018). As the Eighth Circuit alluded to in Tuton, it would be impractical to adopt a rule requiring a final indication in all circumstances because a dog will execute its trained indication when it "identifies the location of the strongest source of the drug odor," Holleman, 743 F.3d at 1156 n.3, but sometimes "a dog can be so overwhelmed by the odor of narcotics that it has 'difficulty pinpointing the strongest source of the odor.'" Tuton, 893 F.3d at 571 (quoting Holleman, 743 F.3d at 1157). The determination of probable cause does not turn on the categorization of Rowdy's behavior being an "alert" or an "indication." Rather, "probable cause depends on the totality of circumstances," which includes Cudmore's and Reede's suspicions, as well as Rowdy's alert behavior. Tuton, 893 F.3d at 571.

After an "initial free pass" around the Mustang, during which Rowdy gave no alert, Reede directed Rowdy to sniff near the seams of the car doors. ST at 63–64. Rowdy alerted to the bottom corner of the driver's door and the front passenger's door. Id. at 65, 67, 68. Rowdy's alert behavior included a change in breathing, where he would close his mouth and begin breathing deeply through his nose, "chambering the air." Id. at 66. He also stuck his head underneath the door on both the driver's and passenger's side and kept pulling Reede from the rear of the car back to those locations. Id. at 67–68. On Reede's third pass around the car, Rowdy jumped up against the driver's side door. Ex. 1 at 00:08:00; ST at 67. Reede testified that such behavior signified drug odor emanating from the vehicle. ST at 69–70.

When Reede asked Costa why Rowdy would alert to drug odor in her car, Costa admitted having marijuana in the vehicle. Id. at 70. Along with Cudmore's prior suspicions that Costa was driving impaired, as well as Cudmore's suspicions that Costa's skin sores were "meth mites" and

12

needle marks, these circumstances, when "viewed through the lens of common sense, created a fair probability that contraband or evidence of a crime [would] be found" upon a search of Costa's vehicle. Tuton, 893 F.3d at 571 (cleaned up and citation omitted).

This Court adopts Judge Moreno's conclusion that Rowdy is a reliable drug sniffing canine. As recognized in Florida v. Harris, "a well-trained dog's alert establishes a fair probability—all that is required for probable cause—that either drugs or evidence of a drug crime . . . will be found." 568 U.S. 237, 246 n.2 (2013). When, as here, a defendant argues that a drug dog is too unreliable to provide officers with probable cause, the relevant inquiry "is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test." Id. at 248.

At the time of the stop, Reede and Rowdy had worked together for more than two years. ST at 56. Reede and Rowdy originally received their certification in narcotics detection through the South Dakota Highway Patrol. Id. at 56. Although "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert," Harris, 568 U.S. at 246, there is additional evidence that Rowdy is trustworthy. Following certification, an officer and his dog must continue to pass a yearly recertification, which Reede and Rowdy completed in April 2023, only two months before the traffic stop at issue. ST at 56. On top of the yearly recertification course, Reede and Rowdy complete 16 hours of field training every month (usually "eight hours every other week") with the South Dakota Highway Patrol. Id. at 93. These monthly training sessions involve running the dogs through four to five various scenarios, including different hides and diversion odors. Id. Based on the evidence presented, this Court finds Rowdy trustworthy and his alerts reliable. Therefore, Rowdy's behavior alerting to

the presence of drug odor from Costa's Mustang, when coupled with the circumstances that led Cudmore and Reede to reasonably suspect that Costa was under the influence of drugs,[5] gave the officer's probable cause to search her car.

### III. Conclusion

For the aforementioned reasons, it is hereby

ORDERED that Defendant Justina Lynn Costa's objections to the Report and Recommendation, Doc. 43, are overruled, and the December 8, 2023 Report and Recommendation, Doc. 42, is adopted. It is further

ORDERED that Defendant Justina Lynn Costa's Motion to Suppress, Doc. 24, is denied.

DATED this  1st  day of February, 2024.

BY THE COURT:

_____
ROBERTO A. LANGE
CHIEF JUDGE

---

[5] During the stop, some of Costa's statements created enhanced suspicion of driving while impaired, including comments expressing surprise that she was in South Dakota and describing her intention to be driving east to Wahpeton, North Dakota, when she in fact was heading westbound some 330 miles away from Wahpeton when she was stopped. ST at 18–19, 48.